Filed 3/28/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re LARRY BAILEY, | C092799 |
| On Habeas Corpus. | (Super. Ct. Nos. 19HC00233,18HC00188) |

APPEAL from a judgment of the Superior Court of Sacramento County, Steve W. White, Judge. Reversed.

Rob Bonta and Matthew Rodriquez, Attorneys General, Phillip J. Lindsay, Senior Assistant Attorney General, Sara J. Romano and Amanda J. Murray, Supervising Deputy Attorneys General, Michael G. Lagrama and Linnea D. Piazza, Deputy Attorneys General, for Appellant.

Byron C. Lichstein, under appointment by the Court of Appeal, for Respondent.

In 2014, a jury found petitioner Larry Bailey guilty of assault with a deadly weapon and leaving the scene of an accident and found true various enhancements. Petitioner was sentenced to 28 years in prison.

"In 2016, voters approved Proposition 57, the 'Public Safety and Rehabilitation Act of 2016.' Proposition 57 amended the California Constitution to grant early parole consideration to persons convicted of a nonviolent felony offense. (Cal. Const., art. I, § 32, subd. (a)(1).)[1] It also authorized the Department of Corrections and Rehabilitation

---

[1] All further references to section 32 and its subdivisions in this opinion are to article I, section 32 of the California Constitution.

1

([Department]) to adopt regulations in furtherance of its guarantee of early parole consideration. (*Id*., subd. (b).) Acting pursuant to this authority, [the Department] issued regulations governing early parole consideration for persons serving a determinate sentence for a nonviolent felony offense. (Cal. Code Regs., tit. 15, §§ 2449.1, 2449.3-2449.7, 3490-3493 (hereafter, the parole regulations).)" (*In re Kavanaugh* (2021) 61 Cal.App.5th 320, 334, fns. omitted.)

In 2017 and 2018, the Board of Parole Hearings (Board) considered petitioner for Proposition 57 parole. In each of the parole consideration proceedings, the Board allowed petitioner to submit a written statement explaining why he should be granted parole. The Board explained, "[t]his is a 'paper review' process" and "[t]here will not be a hearing for you or others to attend." (Bolding omitted.) The Board, through written decisions by a deputy commissioner, both times denied petitioner parole. Petitioner requested administrative review of each of the parole decisions; both decisions were upheld.

Petitioner thereafter filed two petitions for writ of habeas corpus in the trial court. The trial court consolidated the petitions and issued an order to show cause. The trial court denied petitioner's claims challenging the evidentiary sufficiency of the parole denials, but granted petitioner habeas relief after finding he was entitled to "a live parole hearing at which [he] could attend." The trial court interpreted Penal Code section 3041.5 " 'as providing for a hearing for all inmates eligible for parole consideration, at the very least to comply with federal and state due process concerns as well as equal protection.' "

The trial court further ordered the Department to, within 60 days of the finality of the decision, promulgate new parole regulations to reflect the right to an in-person hearing under Proposition 57. The trial court explained " 'it is not necessary for the Department to promulgate regulations that provide for a live hearing in every single case. Rather, the Department could choose to provide for live hearings only for those inmates

2

not granted parole in an initial paper review, upon request of that inmate.' " The Department appeals.

The question before us is whether determinately sentenced nonviolent prisoners eligible for parole consideration under Proposition 57 are constitutionally entitled to an in-person hearing. The answer is, "no." We conclude Proposition 57 neither requires nor impliedly incorporates an in-person hearing requirement, and the Department acted within its delegated authority under section 32, subdivision (b) when it adopted the parole regulations at issue in this appeal. We further conclude the absence of an in-person hearing does not violate equal protection principles, nor does it violate a prisoner's right to procedural due process. We accordingly reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts underlying petitioner's conviction are not material to the disposition of this appeal. We thus do not recite them here. We further do not recite the particulars as to the trial court's decision because our standard of review is de novo. (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208 [equal protection claims are reviewed de novo]; *Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 82 [procedural due process claims are reviewed de novo]; *Wang v. City of Sacramento Police Dept.* (2021) 68 Cal.App.5th 372, 378-379 [statutory construction/ interpretation claims are reviewed de novo].) We recite only the background relevant to the pertinent parole regulations, the validity of which is the subject of this appeal.

### I

#### *Proposition 57*

"In 2009, a three-judge federal district court panel ordered the Department 'to reduce the prisoner population to 137.5% of the adult institutions' total design capacity.' [Citations.] The California Legislature and electorate subsequently enacted several measures aimed to reduce the prison population, including Assembly Bill No. 109 ((2011-2012 Reg. Sess.); Stats. 2011, ch. 15, § 482; criminal realignment) and

3

Proposition 36 (the Substance Abuse and Crime Prevention Act of 2000). Still, the issue persisted and in February 2014 the federal district court ordered the Department to implement additional measures.

"Against this backdrop, in November 2016 the electorate approved Proposition 57. [Citation.] As relevant here, the initiative added section 32 to article I of the California Constitution. The new section states: 'Any person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense.' [Citation.] It further provides that 'the full term for the primary offense means the longest term of imprisonment imposed by the court for any offense, excluding the imposition of an enhancement, consecutive sentence, or alternative sentence.' [Citation.] Finally, as noted earlier, the new provision directs the Department to 'adopt regulations in furtherance of these provisions' and instructs the Secretary of the Department to 'certify that these regulations protect and enhance public safety.' [Citation.]

"Article I, section 32(a) identifies the purposes behind the constitutional provision, stating that it was 'enacted to enhance public safety, improve rehabilitation, and avoid the release of prisoners by federal court order, notwithstanding anything in this article or any other provision of law.' Uncodified portions of Proposition 57 further identify the initiative's purpose and intent. Those purposes, in relevant part, are: '1. Protect and enhance public safety. [¶] 2. Save money by reducing wasteful spending on prisons. [¶] 3. Prevent federal courts from indiscriminately releasing prisoners. [¶] 4. Stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles.' [Citation.] The initiative also states that the 'act shall be liberally construed to effectuate its purposes.' " (*In re Gadlin* (2020) 10 Cal.5th 915, 922-923, fn. omitted.)

4

## II

### *The Pertinent Parole Regulations*

"Under the parole regulations, a person sentenced to a determinate term for a nonviolent felony is generally eligible for early parole consideration when he or she has served the full term of his or her primary offense. [Citations.] [The Department] conducts the parole eligibility reviews and refers eligible prisoners to the Board for parole consideration on the merits. [Citations.] Eligibility reviews are conducted annually 'until the inmate is released from custody or is no longer eligible for parole consideration . . . .' [Citations.]

"If a prisoner is found eligible for parole consideration and referred to the Board, the Board must provide notification about the pending parole review to the prisoner, the prosecuting agency, and the victim(s) who were harmed by the prisoner's crime(s). [Citations.] The Board must also afford the prisoner, the prosecuting agency, and the victim(s) an opportunity to submit a written statement to the Board. [Citations.]

"A hearing officer -- defined by regulation as a Board commissioner, a deputy commissioner, an associate chief deputy commissioner, or the chief hearing officer [citation] -- must then review the 'case on the merits and determine whether to approve the inmate's release,' [citation]. When conducting the merits review, the hearing officer must 'review and consider all relevant and reliable information' including but not limited to the prisoner's central file, the prisoner's documented criminal history, and any written statements submitted by the prisoner, the prosecuting agency, and/or the victim(s). [Citation.] The hearing officer must weigh various aggravating and mitigating factors pertaining to the prisoner's current conviction(s), prior criminal conviction(s) and behavior, and institutional behavior, work history, and rehabilitative programming, as well as the written statements received by the Board. [Citation.] The factors are 'general guidelines' and 'the importance attached to any factor or combination of factors in a particular case is left to the judgment of the hearing officer.' [Citation.]

"The hearing officer must then issue a written decision, supported by a statement of reasons, determining whether the prisoner poses a current, unreasonable risk of violence or a current, unreasonable risk of significant criminal activity. [Citation.] If the hearing officer finds the prisoner poses such a risk, the hearing officer must deny parole release. [Citation.] If the hearing officer finds the prisoner does not pose such a risk, the hearing officer must grant parole release. [Citation.] But, if the parole release decision will result in the prisoner's release two or more years prior to his or her earliest possible release date, the parole release decision must be reviewed by an associate chief deputy commissioner or the chief hearing officer, who may concur with the decision or issue a new decision approving or denying the parole release. [Citation.]

"Within 30 days of being served with the hearing officer's parole release decision, the prisoner may request review of the decision. [Citations.] The request for review must 'include a description of why the inmate believes the previous decision was not correct and may include additional information not available to the hearing officer at the time the previous decision was issued.' [Citation.] A hearing officer not involved in the original decision must then, within 30 days of the Board's receipt of the request for review, 'consider all relevant and reliable information and issue a decision either concurring with the previous decision or overturning the previous decision with a statement of reasons supporting the new decision.' " (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at pp. 336-337, fn. omitted.)

6

## DISCUSSION[2]

### I

### *The Case Is Not Moot*

In a footnote in its reply brief, the Department asserts the trial court's order should be vacated because the order is moot following petitioner's subsequent release to parole. We fail to see how petitioner's release to parole moots the trial court's order directing the Department to promulgate regulations and we agree with *Kavanaugh* that a prisoner's "release from prison does not moot the appeal of the trial court order [that] invalidate[s] the parole regulations." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 340, fn. 8.)

" 'A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief.' " (*In re Stephon L.* (2010) 181 Cal.App.4th 1227, 1231.) In this case, our review can have a practical impact on the trial court's directive to the Department and can provide relief in that regard if we determine (as we do) the trial court erred. We thus consider the merits of the appeal.

### II

### *Proposition 57 Does Not Mandate In-Person Parole Consideration Hearings*

Petitioner argues the constitutional term "parole consideration" in section 32, subdivision (a)(1) incorporates the preexisting procedures specified in statutes and regulations pertaining to parole consideration for other categories of prisoners and thus mandates "a live parole hearing before at least one parole commissioner, not a paper review by a single deputy commissioner" (bolding and underlining omitted). (Citing Cal. Code Regs., tit. 15, §§ 2265-2275, 2300-2310, 2400-2411, 2420-2429.1, 2430-2439.1, 2440-2446.) "The appropriate assumption[, he asserts,] is that the electors were aware of the procedures applicable to offenders already eligible for parole, and incorporated those

---

[2]    The Department's unopposed motion for judicial notice is granted.

7

procedures into Proposition 57." Petitioner further believes the Proposition 57 Voter Information Guide (guide) supports his position because it "explained the typical parole process in California" as the Board conducting a parole consideration hearing. The only logical inference, in petitioner's view, is that "the voters' intent was to apply the standard parole consideration process in the Proposition 57 parole context."

The Department does not address the foregoing argument directly in its reply brief. In its opening and reply briefs, the Department instead argues determinately sentenced nonviolent prisoners subject to Proposition 57 are not entitled to an in-person hearing under Penal Code section 3041.5 because the statute applies only to "inmates serving indeterminate sentences and those serving lengthy sentences who qualify for youth offender or elderly parole." The Department believes Proposition 57's plain language vests it with the obligation and authority to create a parole process for eligible prisoners and it has wide discretion to promulgate an independent regulatory scheme to implement that process.

We conclude Proposition 57 neither requires nor impliedly incorporates an in-person hearing requirement, and the Department acted within its delegated authority under section 32, subdivision (b) when it adopted the parole regulations, which do not provide for an in-person hearing.

A

*Standard Of Review And Principles Of Statutory Interpretation*

"To determine whether the regulation here is consistent with the constitutional provisions enacted by Proposition 57, we must interpret the constitutional provisions themselves. Our 'primary concern' in construing a constitutional provision enacted through voter initiative is 'giving effect to the intended purpose of the provisions at issue.' [Citation.] And, '[i]n interpreting a voter initiative . . . , we apply the same principles that govern statutory construction.' [Citation.] In doing so, we look to the text of the constitutional provision at issue and, as appropriate, extrinsic sources such as an

8

initiative's ballot materials." (*In re Gadlin*, *supra*, 10 Cal.5th at pp. 926-927.)

"In undertaking this analysis, we ask whether the regulation is ' "consistent and not in conflict with" ' the constitutional provision that authorizes it [citation] and whether the regulation is reasonably necessary to effectuate the purpose of the authorizing law [citations]. Our task ' " 'is to decide whether the [agency] reasonably interpreted the legislative mandate.' [Citation.]" ' [Citation.] In doing so, we presume the validity of the regulation [citation]; the burden lies with the party challenging the regulation to show its invalidity [citation]." (*In re Mohammad* (2022) 12 Cal.5th 518, 529.)

B

*Proposition 57 Did Not Incorporate An In-Person Hearing Requirement*

1

*The Ordinary Meaning Of "Parole Consideration" Is To Give*

*Careful Thought And Deliberation To A Prisoner's Parole Suitability*

We agree with the *Kavanaugh* court's interpretation of "parole consideration" in section 32, subdivision (a)(1).[3] As in *Kavanaugh*, "[t]he parties have not directed us to any constitutional or statutory definitions for the term 'parole consideration,' and we are aware of none based on our own research." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 345.) "In the absence of such definitions, we presume the words were intended to be understood ' "in [their] ordinary sense and, consequently, we may refer to [those words'] dictionary definition[s] to ascertain [their] ordinary, usual meaning." ' [Citations.]

"Webster's dictionary defines the term 'consideration,' as relevant here, to mean 'the act of regarding or weighing carefully.' [Citation.] Similarly, the online Oxford

---

[3] In *Kavanaugh*, the court considered whether "section 32's guarantee of parole consideration for eligible felons includes an implicit promise that such felons will receive the assistance of legal counsel during the parole process, as well as in-person parole hearings and multimember parole panels." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 344.)

English Dictionary defines 'consideration' to mean '[t]he keeping of a subject before the mind; attentive thought, reflection, meditation.' [Citation.] The American Heritage Dictionary gives 'consideration' an analogous meaning, defining it as '[c]areful thought; deliberation.' [Citation.] Collectively, these definitions indicate that 'parole consideration' refers to the giving of careful thought and deliberation to a person's parole suitability." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at pp. 345-346.)

2

*The Term "Parole Consideration" Is Not Susceptible To Petitioner's Interpretation*

Petitioner asserts we should ascribe to "parole consideration" its ordinary meaning while taking into account "related provisions and the structure of the relevant statutory and constitutional scheme." (Citing *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933.) In petitioner's view, the term incorporates an in-person hearing requirement because, "under statutory and regulatory law in effect at the time Proposition 57 was passed, parole consideration occurred at a live hearing before a panel consisting of at least one commissioner." He asserts the "[e]lectors are presumed to be aware of existing statutory and regulatory law, and thus electors voting on Proposition 57 are presumed to have had that same understanding of what parole consideration means." We note several problems with petitioner's argument.

First, none of the statutes or regulations relied upon by petitioner define "parole consideration." The statutes and regulations instead identify the procedural and substantive requirements pertinent to parole proceedings for different categories of prisoners. Indeed, most of the titles of the articles in chapter 3 of division 2 of title 15 of the California Code of Regulations *when Proposition 57 passed* were titled "parole consideration procedures," "parole consideration criteria and guidelines," and "parole consideration hearings" as to different categories of prisoners. (Capitalization omitted.) None of the articles were titled simply "parole consideration" when Proposition 57 passed. "Had the drafters of Proposition 57, and by extension the voters, intended to

10

[require "a live parole hearing before at least one parole commissioner" (bolding and underlining omitted), as petitioner asserts], it would have been a simple matter to say so explicitly." (*In re Gadlin*, *supra*, 10 Cal.5th at p. 935.)

Second, if we presume the voters knew existing law when voting on Proposition 57, we must presume the voters were aware that, when they voted, Penal Code section 3041.5's hearing requirements were *inapplicable* to determinately sentenced prisoners.[4] (*In re Jackson* (1985) 39 Cal.3d 464, 468 [Pen. Code, § 3040 et seq. "apply to all inmates not serving a determinate sentence"].) Nothing in Proposition 57 informed the voters that passage of the proposition would change existing law (other than as expressly stated in the proposition) or expand the application of Penal Code section 3040 et seq. to determinately sentenced prisoners. Instead, Proposition 57 informed the voters the Department would be tasked with adopting regulations in furtherance of section 32, which is consistent with the Department's established history of adopting and implementing regulations pertaining to parole consideration. (See Cal. Code Regs., tit. 15, div. 2, ch. 3.)

Third, to determine whether the voters intended to incorporate Penal Code section 3041.5 into Proposition 57 proceedings, we must consider and analyze the statute as a whole and not only the favorable cherry-picked portions of the statute upon which petitioner relies. In that regard, the in-person hearing requirement in Penal Code section 3041.5 is but one of the statute's requirements. The statute further requires that, among other things, if the Board denies parole, it shall schedule the next hearing for a

---

[4]    Penal Code section 3041.5, subdivision (a) imposes various requirements "[a]t all hearings for the purpose of reviewing an inmate's parole suitability, or the setting, postponing, or rescinding of parole, with the exception of en banc review of tie votes." One of those requirements is that "[t]he inmate shall be permitted to be present, to ask and answer questions, and to speak on his or her own behalf." (Pen. Code, § 3041.5, subd. (a)(2).)

date between three and 15 years into the future depending on the enumerated criteria. (Pen. Code, § 3041.5, subd. (b)(3)(A)-(C).) Imposing such a lengthy time frame on subsequent parole consideration hearings for determinately sentenced nonviolent prisoners would undermine the voters' intent to avoid the indiscriminate release of prisoners by federal court order. (§ 32, subd. (a); Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141.) Expediency in conducting parole consideration proceedings in contrast would further the voters' intent. To that end, and in contrast to Penal Code section 3041.5, the parole regulations provide that the eligibility reviews for prisoners subject to Proposition 57 shall be conducted *annually* "until the inmate is released from custody or is no longer eligible for parole consideration . . . ." (Cal. Code Regs., tit. 15, §§ 3492, subd. (b), 2449.4, subd. (h).) Petitioner cannot divorce the in-person hearing requirement in Penal Code section 3041.5 from the remainder of the requirements in the statute, portions of which undermine the voters' intent in passing Proposition 57.

Fourth, the guide does not support petitioner's voter awareness argument. "The ballot materials presented to the voters consisted of three sections: the official title and summary prepared by the Attorney General, the analysis of the Legislative Analyst, and the arguments in favor of and against the proposition (an argument in favor by the proponents followed by a rebuttal by the opponents, and an argument against by the opponents followed by a rebuttal by the proponents)." (*In re Gadlin*, *supra*, 10 Cal.5th at p. 936.) Petitioner relies on the Legislative Analyst's analysis, asserting the summary of the "typical parole process in California" as the Board conducting " 'a parole consideration hearing' " and statement the Board "would decide whether to release these individuals" "suggest the voters' intent was to apply the standard parole consideration process in the Proposition 57 parole context." We disagree.

"The analysis by the Legislative Analyst provided a broad description of the then-existing sentencing and parole consideration scheme." (*In re Gadlin*, *supra*, 10 Cal.5th at

12

p. 936.) The Legislative Analyst first distinguished between indeterminate and determinate sentences and then, under the heading "parole consideration hearings" (bolding and capitalization omitted), explained: "After an individual serves the minimum number of years required for an indeterminate sentence, the [Board] conducts a parole consideration hearing to determine whether the individual is ready to be released from prison. For example, [the Board] would conduct such a hearing for an individual sentenced to 25-years-to-life after the individual served 25 years in prison. If [the Board] decides not to release the individual from prison, the [B]oard would conduct a subsequent hearing in the future. Individuals who receive a determinate sentence do not need a parole consideration hearing to be released from prison at the end of their sentence. However, some of these individuals currently are eligible for parole consideration hearings before they have served their entire sentence. For example, certain individuals who have not been convicted of violent felonies are currently eligible for parole consideration after they have served half of their prison sentence. This was one of several measures put in place by a federal court to reduce the state's prison population." (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 57 by Legis. Analyst, p. 54.) The federal court order noted by the Legislative Analyst in the background section was the "February 2014 federal court order in *Coleman/Plata* known as nonviolent second strike offender parole." (*In re Gadlin*, at pp. 936-937.)

The Legislative Analyst next described the changes to the parole system that would result from the passage of Proposition 57. Under the heading "parole consideration for nonviolent offenders" (bolding and capitalization omitted), it explained: "The measure changes the State Constitution to make individuals who are convicted of 'nonviolent felony' offenses eligible for parole consideration after serving the full prison term for their primary offense. As a result, [the Board] would decide whether to release these individuals before they have served any additional time related to other crimes or sentencing enhancements.

13

"The measure requires [the Department] to adopt regulations to implement these changes. . . . As of September 2015, there were about 30,000 individuals in state prison who would be affected by the parole consideration provisions of the measure. In addition, about 7,500 of the individuals admitted to state prison each year would be eligible for parole consideration under the measure. Individuals who would be affected by the above changes currently serve about two years in prison before being considered for parole and/or released. Under the measure, we estimate that these individuals would serve around one and one-half years in prison before being considered for parole and/or released." (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 57 by Legis. Analyst, p. 56.)

Finally, the Legislative Analyst considered the anticipated fiscal effects of the initiative "[b]ased on recent [Board] experience with parole consideration for certain nonviolent offenders," pursuant to the federal court order. (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 57 by Legis. Analyst, p. 56.) The Legislative Analyst estimated "the ongoing fiscal impact of this provision would likely be state savings in the tens of millions of dollars annually" but such savings "would be offset somewhat by additional costs for [the Board] to conduct more parole considerations." (*Ibid*.)

We agree with *Kavanaugh* that, while "[t]he Legislative Analyst's analysis obliquely references the parole consideration hearings that are provided to indeterminately sentenced persons *and* the [nonviolent second strike offender] parole consideration process," "neither the analysis nor any other portion of the ballot materials states that the parole consideration guaranteed by Proposition 57 would resemble either of these processes, nor that it would resemble one of the processes to the exclusion of the other." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 349.) We find nothing in the

14

guide indicating the voters intended to impliedly incorporate the then-existing parole consideration procedures pertinent to indeterminately sentenced prisoners.[5]

It is further significant that, although the Legislative Analyst discussed *hearings* conducted under the then-existing parole consideration proceedings in the background portion of the analysis, the word "hearing" is appreciably absent in the proposal section of the analysis addressing the changes to the parole system that would result from the passage of Proposition 57. Indeed, in the proposal section of the analysis, the Legislative Analyst merely refers to "parole consideration," in contrast to its discussion of "parole consideration hearings" in the background portion of the analysis. (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 57 by Legis. Analyst, pp. 54, 56, bolding, italics, and capitalization omitted.) As an additional contrast, in the proposal section of the analysis, immediately following the parole consideration discussion, the Legislative Analyst specifically addressed "juvenile transfer hearings," regarding Proposition 57's changes pertinent to transfers of juveniles to adult court. (Voter Information Guide, Gen. Elec., *supra*, analysis of Prop. 57 by Legis. Analyst, p. 56, bolding, italics, and capitalization omitted.)

The Legislative Analyst thus used the word "hearing" purposefully and deliberately in its analysis. The absence of the word in describing the parole consideration proposed under Proposition 57 signals the Legislative Analyst's understanding that no hearing requirement would be *imposed* under Proposition 57. We find no indication the Legislative Analyst intended to convey to the voters or that the

---

[5] The statutes and regulations applicable to parole consideration for indeterminately sentenced prisoners provide for the appointment of legal counsel for potential parolees, in-person parole hearings, and multimember parole panels. (*In re Kavanaugh, supra,* 61 Cal.App.5th at p. 347.)

voters understood that Proposition 57 would require an in-person hearing in parole consideration proceedings.

Petitioner attacks *Kavanaugh*, asserting there was no basis for the court suggesting the voters intended to incorporate into Proposition 57 the nonviolent second strike offender parole consideration procedures that did not require a live hearing. Petitioner misapprehends the following excerpt of that court's opinion: "Returning to the presumption of voter awareness, it is untenable for us to conclude the voters were somehow *aware* of the parole consideration process available to indeterminately sentenced felons, yet inexplicably *unaware* of the [nonviolent second strike offender] parole consideration process. It is equally untenable for us to conclude the voters intended to replicate the former process, as opposed to the latter process -- or to adopt a new process altogether -- given that the language of Proposition 57 evinces no such intention. In light of this textual omission, we decline to infer through sheer speculation that the voters who passed Proposition 57 intended to adopt the broad and complex swathe of procedural requirements governing parole consideration for indeterminately sentenced felons." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at pp. 348-349.) The court did *not* state or imply that the voters intended to incorporate into Proposition 57 the nonviolent second strike offender parole consideration procedures; rather, the court explained there was no basis for presuming the voters intended to incorporate the parole consideration procedures applicable to *either* indeterminately sentenced prisoner proceedings *or* nonviolent second strike offender proceedings. We thus find no merit in petitioner's attack on *Kavanaugh*.

*McGhee* also does not assist petitioner. (Citing *In re McGhee* (2019) 34 Cal.App.5th 902.) Petitioner asserts in a cursory sentence that the existing parole regulations amount to a "preliminary screening process" by the Department, which was rejected in *McGhee*, "because it is not considered by the Parole Board." In the absence of any further clarification or analysis as to *how* the parole consideration process under the

16

existing parole regulations amount to a preliminary screening process, we cannot analyze the contention in any meaningful manner. We decline to make assumptions regarding the underlying argument. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 [we do not make arguments for the parties and may and do disregard conclusory arguments failing to disclose a party's reasoning in reaching the conclusion he, she, they, or it asks us to adopt].)

Petitioner further relies on the *McGhee* court's statement the guide "indicates that Proposition 57 would provide the same type of hearing to individuals convicted of nonviolent felonies," as provided to indeterminately sentenced prisoners. (*In re McGhee*, *supra*, 34 Cal.App.5th at p. 911.) The *McGhee* court, however, did not consider whether Proposition 57 requires a hearing; the court instead considered the viability of a regulation requiring the Department to conduct a prescreening of otherwise eligible inmates before referring those inmates to the Board for parole consideration. (*In re McGhee*, at p. 905.) " 'It is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.) We agree with the Department that *McGhee* "concerns *who* must make parole consideration decisions; not *what procedures* must be provided."

Having considered and rejected petitioner's arguments, we see no basis for finding the term "parole consideration" ambiguous. The dictionary definition adopted by the *Kavanaugh* court constitutes the plain meaning of the term; the term does not impliedly incorporate any procedural requirements pertinent to other pre-existing parole consideration proceedings.

3

*The Parole Regulations Are In Harmony With Section 32 And*

*Reasonably Necessary To Effectuate The Purposes Of Proposition 57*

We agree with *Kavanaugh* that "[w]hen the term 'parole consideration' is given th[e] common and ordinary meaning [of 'the giving of careful thought and deliberation to

17

a person's parole suitability'], it is apparent the parole regulations are in harmony with section 32." (*In re Kavanaugh, supra*, 61 Cal.App.5th at p. 346.) "The parole regulations require the referral of each eligible prisoner to the Board for a parole assessment whereby a hearing officer reviews all relevant information and applies criteria to determine whether the prisoner poses a risk of violence or significant criminal activity. [Citations.] Depending on the outcome of the assessment, the hearing officer then approves or denies parole release. [Citations.] In short, the Board affords parole consideration to the prisoner when the hearing officer reviews the prisoner's record and weighs various factors bearing on the prisoner's parole suitability in order to reach a reasoned parole release decision." (*Ibid*.)

We discern no conflict between the parole regulations at issue in this appeal and section 32 and conclude the Department reasonably interpretated the legislative mandate to promulgate regulations in furtherance of implementing section 32.

III

*The "Paper Review" Process Does Not Violate Equal Protection Principles*

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195.) "The right to equal protection of the law is violated when 'the government . . . treat[s] a [similarly situated] group of people unequally without some justification.' " (*People v. Love* (2020) 55 Cal.App.5th 273, 287.) "To succeed on an equal protection claim, [petitioner] must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*Edwards*, at p. 195.)

If a class of criminal defendants is similarly situated for purposes of the law challenged to another class of defendants who are treated differently, but the law does not involve a suspect class or a fundamental right, courts next look to determine whether there is a " 'rational relationship between the disparity of treatment and some legitimate

18

governmental purpose.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) "This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.' " (*Id*. at pp. 74-75.)

Petitioner believes the trial court correctly reasoned the parole regulations violate equal protection principles if Proposition 57 does not incorporate Penal Code section 3041.5's in-person hearing requirement. Petitioner explains: "[T]he superior court compared two classes of offenders serving the same primary term for the same nonviolent offense: on one hand, a third striker serving an indeterminate term for a nonviolent offense, and on the other hand a non-third striker serving the same primary term for the same nonviolent offense. [Citation.] Both offenders would become eligible for parole consideration at the same time (the completion of the primary term for the nonviolent offense), but, under [the Department's] interpretation of Proposition 57, only the third striker would receive a live hearing, while the non-third striker would receive a paper review." Petitioner's *entire* argument rests on the premise that "determinately and indeterminately sentenced offenders are 'similarly situated' for purposes of Proposition 57."

The Department asserts inmates serving determinate sentences for nonviolent felony offenses are not similarly situated to inmates serving life or long-term sentences for serious and violent felony offenses because "[c]ourts have long held that inmates convicted of different crimes are not similarly situated." The Department further argues that, even if petitioner's similarly situated argument passes muster, a rational basis supports the difference in treatment between the groups because, "given the severity of their crimes and the need to preserve public safety, it is rational for the state to subject

19

inmates with life or long-term sentences to a parole hearing on the basis they require closer examination by the Board."

The flaw in petitioner's argument is that he focuses on only one aspect of the equal protection analysis. Even if determinately and indeterminately sentenced prisoners are similarly situated for purposes of Proposition 57 as petitioner asserts (a contention we need not and do not consider), the equal protection argument lacks merit because the Department has shown a rational basis for treating the two classes of prisoners differently.

Included in the record is the Department's initial statement of reasons in support of the regulations to be adopted or amended in compliance with section 32, dated April 19, 2019. Therein, the Department explained it had previously adopted regulations pursuant to Proposition 57 to create "a process for determinately-sentenced nonviolent offenders to be reviewed for parole after serving the full term of their primary offense." The regulations to be adopted and amended concerned regulations "necessary to implement and interpret provisions of Proposition 57 and the court's order in *In re Edwards*[(2018) 26 Cal.App.5th 1181] by establishing a parole consideration process that provides indeterminately-sentenced nonviolent offenders a mechanism to be considered for parole upon serving the full term of their primary offense."

The Department explained: "In establishing this process, the Department found it necessary to consider both the previously established parole process for determinately-sentenced nonviolent offenders as well as the current parole consideration process for inmates sentenced to indeterminate terms of life with the possibility of parole. Specifically, the increased length of potential incarceration and the severity of their criminal histories warrant greater scrutiny for indeterminately-sentenced nonviolent offenders, such as an in-person hearing before the Board that is recorded and transcribed, comprehensive risk assessments by a forensic psychologist, appointment of counsel, and interpreters present, if needed. Thus, these regulations establish a nonviolent parole

20

consideration process that in part mirrors the eligibility and public safety determinations of the existing nonviolent parole process for determinately-sentenced inmates, while also requiring a full parole consideration hearing similar to those currently conducted under Penal Code sections 3040, et seq., for other life-term inmates."

As the Department explained, indeterminately sentenced nonviolent offenders are treated differently given the increased length of potential incarceration and the severity of their criminal histories. Returning to petitioner's "third striker" example, we note "[t]he three strikes law [wa]s the Legislature's attempt to address the threat to society posed by the class of persons previously convicted of serious or violent felonies." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 829.) A third-strike offender is a recidivist with two or more prior violent or serious felony convictions. (Pen. Code, §§ 667, subds. (b)-(j), 1170.12.) "Violent and serious felony offenses differ from other offenses in many ways, including the reasons and motives of the criminal, the outrage and harm to the victim, and the potential for danger to the victim and society in general. Such differences warrant different treatment." (*Cooper*, at p. 829.)

There is thus a rational basis for requiring greater scrutiny in parole consideration proceedings for indeterminately sentenced nonviolent offenders as compared to determinately sentenced nonviolent offenders when considering public safety -- one of the foundational purposes of Proposition 57. (§32, subd. (a) [provisions enacted "to enhance public safety"].) The Department, in its expertise, has determined that such greater scrutiny necessitates, among other requirements, an in-person hearing for indeterminately sentenced nonviolent prisoners. Petitioner presents no argument to challenge the Department's rationale and we accordingly find no basis for concluding the parole regulations violate equal protection.

21

# IV

## *The "Paper Review" Process Does Not Violate Procedural Due Process*

The Department asserts "[n]either state nor federal due process principles entitle determinately-sentenced nonviolent offenders, like Bailey, to in-person parole hearings when being considered for parole under Proposition 57." Petitioner asserts "United States Supreme Court precedent demonstrates procedural due process in this context requires a live hearing" (bolding omitted) and an analysis of the pertinent factors favors his position. The *Kavanaugh* court recently concluded Proposition 57's procedures specified in "the parole regulations do not violate the procedural due process rights of prisoners." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 359.) We agree with *Kavanaugh*.

Although the Board's discretion in making parole release decisions is broad and has been described as " 'almost unlimited,' " that discretion is subject to a prisoner's right to procedural due process. (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 352.) "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333 [47 L.Ed.2d 18, 32].) In discerning what is meaningful as to time and manner, we are mindful that "due process is flexible and calls for such procedural protections as the particular situation demands." (*Morrissey v. Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494].)

To evaluate what procedural protections are due under the federal and state due process clauses, "we consider the following factors: '(1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, (3) the dignitary interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official, and (4) the governmental interest,

22

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at pp. 352-353, fn. omitted; *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 213 ["With a minor modification, [i.e., the addition of the dignitary interest factor], we have adopted the [federal] balancing test as the default framework for analyzing challenges to the sufficiency of proceedings under our own due process clause"].)

As the *Kavanaugh* court explained, as to the first factor, "in a parole consideration proceeding, the private interest at stake is not a prisoner's interest in his or her conditional liberty; rather, it is the mere *expectancy* of his or her conditional liberty -- a 'limited liberty interest.' " (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 355.) Petitioner asserts "the California Supreme Court has not used" terminology characterizing a parole eligible inmate's liberty interest as "limited" and believes "[t]he liberty interest in this case is the same as that previously recognized by the California Supreme Court's parole cases." Petitioner relies on *In re Lawrence*, in which our Supreme Court discussed an "inmate's due process liberty interest in parole." (Citing *In re Lawrence* (2008) 44 Cal.4th 1181, 1191.)

We discern no credible quibble with the term "limited liberty interest." The term simply means " ' "[a]n incarcerated individual for whom a parole date has not been set possesses less of an expectation of liberty than one for whom a release date previously has been established by the Board," ' " as the *Kavanaugh* court explained. (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 355.) The foregoing explanation hails from a California Supreme Court decision -- *In re Rosenkrantz* (2002) 29 Cal.4th 616, 656. The use of the term "limited liberty interest" is thus consistent with established California Supreme Court precedent.

Turning to the second factor -- the risk of erroneous deprivation of the interest through the procedures used -- *Kavanaugh* explained a prisoner: receives notice of the

23

referral to the Board and information about the parole process (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 355); may submit a written statement to the Board discussing mitigating factors, addressing any aggravating factors, and highlighting the prisoner's rehabilitation in prison (*id*. at pp. 355-356); and may request review of an adverse parole decision (*id*. at p. 356). The hearing officer is required to: "consider the prisoner's statement, in addition to all other relevant and available information pertaining to the prisoner" (*id*.at p. 355); and "issue a written parole decision, supported by a statement of reasons" to prevent arbitrary and unsupported parole denials and provide the prisoner with the information necessary to determine whether to challenge the denial (*id*. at p. 356). Further, if the prisoner seeks review of an adverse parole decision: the prisoner "has an opportunity to articulate why . . . the initial parole decision was incorrect and provide additional information not available to the hearing officer when the initial parole decision was made"; and "[t]he review is conducted by a hearing officer who was not involved in the initial parole decision." (*Ibid*.) The *Kavanaugh* court concluded that, "[c]ollectively, these procedural requirements ensure that a prisoner eligible for parole has a reasonable opportunity to inform the Board of any considerations weighing in favor of . . . parole suitability." (*Ibid*.) We agree.

Petitioner does not address the *Kavanaugh* court's analysis of this factor. He instead relies heavily on *Kelly* for the proposition that written statements are insufficient to mitigate the risk of erroneous deprivation and to protect a prisoner's liberty interest in parole suitability determinations. (Citing *Goldberg v. Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287].) We are not persuaded.

In *Kelly*, the United States Supreme Court considered "whether a State that terminates public assistance payments to a particular recipient without affording him the opportunity for an evidentiary hearing prior to termination denies the recipient procedural due process in violation of the Due Process Clause of the Fourteenth Amendment." (*Goldberg v. Kelly*, *supra*, 397 U.S. at p. 255 [25 L.Ed.2d at p. 292].) The court

24

concluded an evidentiary hearing was required under such circumstances, where a recipient could personally appear to present evidence and confront or cross-examine adverse witnesses. (*Id*. at pp. 267-268, 270 [25 L.Ed.2d at pp. 299, 300].) *Kelly* is distinguishable because "the crucial factor in th[at] context -- a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended -- [wa]s that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." (*Id*. at p. 264 [25 L.Ed.2d at p. 297].) A prisoner's entitlement to be considered for parole is vastly different from a person's protected liberty interest in welfare benefits presently enjoyed.

We also agree with *Kavanaugh*'s analysis of the governmental interest factor. As *Kavanaugh* noted: "We agree hearings 'may be useful in resolving conflicting information and in the introduction of subjective factors into the decision making process that might otherwise not be considered; it thereby may often tend to enhance the accuracy and reliability of the exclusion decision.' [Citation.] The prisoner's body language may assist the parole decision maker 'in assessing signs of remorse and the effect of age' [citation] -- factors that may in turn impact the parole suitability decision. [Citation.] 'And even in cases in which [in-person] participation [at a parole hearing] is unlikely to affect the outcome of the [parole] decision, it nevertheless promotes important dignitary values that underlie due process.' " (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at pp. 357-358.) "[T]hese potential benefits cannot[, however,] be considered in isolation without accounting for the weighty fiscal and administrative burdens that in-person parole hearings would impose on the government." (*Id*. at p. 358.)

The *Kavanaugh* court explained that, "[b]ased on the costs associated with in-person parole hearings for indeterminately sentenced prisoners," it is estimated that "it would cost the Board tens of millions of dollars annually to conduct in-person parole

25

hearings for all eligible determinately sentenced nonviolent prisoners." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 358.) The court took judicial notice of administrative notices and statements indicating "that nearly 30,000 inmates were screened for early parole consideration after voters passed Proposition 57" and noted "the Governor allocated $8.2 million in his proposed annual budget for the implementation of the early parole consideration process for indeterminately sentenced felons." (*Id*. at p. 358, fns. 17 & 18.) Additionally, it is reasonable to "infer in-person parole hearings would consume substantially more time than a documentary review of a prisoner's parole suitability -- both to prepare for the in-person hearing and to conduct the in-person hearing." (*Id*. at p. 358.) The significant fiscal and administrative burdens associated with in-person hearings outweigh the usefulness of in-person hearings when considering the subjective analysis in parole release decisions "is not so readily adapted to procedural due process safeguards as are decisions that turn on specific factual questions . . . ." (*People v. Ramirez* (1979) 25 Cal.3d 260, 273.)

Petitioner asserts the burden in this instance would be lessened by the trial court's limitation of in-person parole hearings to only those "nonviolent offenders who are not granted release based on an initial paper review, and who then request a hearing." Petitioner cites no evidence, however, estimating the financial cost associated with the trial court's proposal or estimating the cost savings that would be achieved by implementing that proposal in comparison to providing in-person hearings for all Proposition 57 parole consideration hearings. "Appellate review is generally limited to matters contained in the record. Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 102.)

Petitioner further argues that "as a general matter, fiscal and administrative burdens are not significant enough to justify depriving due process of law." (Citing *People v. DeLeon* (2017) 3 Cal.5th 640, 658.) *DeLeon* has no application to the analysis

before us. In that case, our Supreme Court considered whether the transfer of jurisdiction over most parole revocation hearings from the Board to the superior courts rendered a preliminary hearing unnecessary. (*Id*. at p. 644.) Our Supreme Court explained the United States Supreme Court had previously found that "parolees facing revocation are constitutionally entitled to . . . a prompt preliminary hearing after arrest to determine whether there is probable cause to believe a parole violation has occurred." (*Ibid*.) The court held that, even though preliminary hearings may burden the superior courts, the "legitimate institutional concern . . . cannot justify depriving a parolee of his right to due process of law." (*Id*. at p. 658.) *DeLeon* is simply inapposite to the circumstances presented here. We do not read the case to stand for the general proposition advanced by petitioner.

Finally, we agree with *Kavanaugh* that the parole regulations "promote the dignitary values of the persons seeking parole release." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 359.) That is because "the parole regulations permit prisoners to make their case for parole release in ways other than in-person parole hearings," as explained *ante*. (*Ibid*.)

As in *Kavanaugh*: "Balancing all these factors, we conclude the parole regulations do not violate the procedural due process rights of [determinately sentenced nonviolent] prisoners. We acknowledge in-person parole hearings might increase the accuracy of some parole release decisions and promote the dignity interests of prisoners. However, in our view, those potential benefits simply do not prevail over all the other factors weighing against a new constitutionally based right to annual, in-person parole hearings. We are particularly cognizant of the fact that prisoners have limited liberty interests in parole release proceedings, as well as the obvious and considerable fiscal and administrative burdens flowing from in-person parole hearings. And while the parole regulations may not assure error-free parole decisions in all cases, they contain numerous features that reduce the risk of arbitrary parole decisions. Many of those same features

27

promote prisoners' dignitary interests. Considering all these factors, we conclude the parole regulations afford prisoners reasonable notice and a reasonable opportunity to be heard. That is all due process requires." (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 359.)

We do not find the United States Supreme Court cases relied upon by petitioner to require a contrary conclusion. Petitioner asserts the United States Supreme Court in *Greenholtz* and *Swarthout* mandated an in-person hearing requirement in circumstances such as those presented by Proposition 57. (Citing *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex* (1979) 442 U.S. 1 [60 L.Ed.2d 668] & *Swarthout v. Cooke* (2011) 562 U.S. 216 [178 L.Ed.2d 732].) He believes "taken together the two cases make clear that a live hearing is the minimum process required to comply with procedural due process." In his view, "[t]hat conclusion follows from 1) the fact that *Greenholtz* involved a parole procedure where inmates could appear in person and speak to the Parole Board [citation], and 2) *Swarthout*'s clear statement that 'the minimum procedures adequate for due process protection' are 'those set forth in *Greenholtz*.' " Petitioner is mistaken.

The question in *Greenholtz* was whether the Nebraska parole determination procedures met the constitutional due process requirements. (*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, *supra*, 442 U.S. at p. 3 [60 L.Ed.2d at p. 673].) More specifically, however, "since the Nebraska Parole Board provide[d] at least one and often two hearings every year to each eligible inmate, [the court] need[ed] only consider whether the additional procedures mandated by the Court of Appeals [we]re required." (*Id*. at p. 14 [60 L.Ed.2d at p. 680].) The United States Supreme Court concluded: "The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." (*Id*. at p. 16 [60 L.Ed.2d at p. 681].)

28

In *Swarthout*, the United States Supreme Court reiterated that when a state creates a liberty interest in receiving parole, such as that created by California law, "the Due Process Clause requires fair procedures for its vindication." (*Swarthout v. Cooke*, *supra*, 562 U.S. at p. 220 [178 L.Ed.2d at p. 736].) "In the context of parole, [however,] the procedures required are minimal." (*Ibid.*) The United States Supreme Court explained: "In *Greenholtz*, we found that a prisoner subject to a parole statute similar to California's received adequate process when he was allowed an opportunity to be heard and was provided a statement of the reasons why parole was denied. [Citation.] 'The Constitution,' we held, 'does not require more.' " (*Ibid.*) The United States Supreme Court concluded the procedures at issue before it provided "at least this amount of process" because the prisoners "were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied." (*Ibid.*)

From *Greenholtz* and *Swarthout* we glean the following: (1) when a state creates a liberty interest in receiving parole, the state must provide prisoners with the minimal due process protections of an opportunity to be heard and a statement of reasons if parole is denied; and (2) if a state provides a prisoner with an in-person parole suitability hearing where the prisoner may speak, the procedure adequately provides an opportunity to be heard. Neither *Greenholtz* nor *Swarthout*, however, stands for the proposition "[t]hat live opportunity to speak to the Parole Board . . . is part of the 'minimum' necessary procedure" to satisfy procedural due process, as petitioner asserts. That is because the United States Supreme Court did *not* in either *Greenholtz* or *Swarthout* consider whether an in-person hearing *is required* to provide an inmate with an opportunity to be heard. As explained *ante*, " '[i]t is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo*, *supra*, 13 Cal.4th at p. 388.)

We also do not find pertinent the United States Supreme Court's statement in *Swarthout* that "the minimum procedures adequate for due-process protection of [a

29

prisoner's liberty interest in receiving parole] are those set forth in *Greenholtz*." (*Swarthout v. Cooke*, *supra*, 562 U.S. at p. 221 [178 L.Ed.2d at p. 737].)  When read in context with the preceding paragraph in that case and considering the facts of *Greenholtz*, it is clear the United States Supreme Court referred to the minimum procedures of providing an opportunity to be heard and a statement of reasons if parole is denied.  As already explained, nothing in *Greenholtz* or *Swarthout* states an opportunity to be heard *requires* an in-person hearing.  Further, as noted in *Kavanaugh*, "numerous lower federal courts have found the parole regulations do not violate prisoners' procedural due process rights under the federal Constitution" and "there is federal appellate authority standing for the proposition that in-person parole hearings are not guaranteed by the federal due process clause."  (*In re Kavanaugh*, *supra*, 61 Cal.App.5th at p. 359, fn. 19.)

Finally, petitioner asserts "[a]t least one other procedural due process case from the prison context strongly favors [his] position."  (Citing *Wolff v. McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935].)  In *Wolff*, the United States Supreme Court "held that due process protected . . . inmates from the arbitrary loss of the statutory right to [good-time] credits because they were provided subject only to good behavior."  (*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, *supra*, 442 U.S. at p. 12 [60 L.Ed.2d at p. 678].)  The court explained, "[s]ince prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed."  (*Wolff*, at p. 558 [41 L.Ed.2d at p. 952].)  As such, the United States Supreme Court discussed the minimum due process procedures required under such circumstances, including "advance written notice of the claimed violation[,] a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken," and an opportunity "to call witnesses and present documentary evidence in his defense when

permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." (*Id.* at pp. 563, 566 [41 L.Ed.2d at pp. 955, 956].)

As the United States Supreme Court explained in *Greenholtz*, however, "[p]rocedures designed to elicit specific facts, such as those required in . . . *Wolff*, are not necessarily appropriate to a [state's] parole determination. [Citations.] Merely because a statutory expectation exists cannot mean that in addition to the full panoply of due process required to convict and confine there must also be repeated, adversary hearings in order to continue the confinement." (*Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, *supra*, 442 U.S. at p. 14 [60 L.Ed.2d at pp. 679-680].) In other words, the circumstances pertaining to the loss of statutory good-time credits in *Wolff* and parole suitability determinations are not the same and do not require the same procedural safeguards to meet due process protections.

For the foregoing reasons, we conclude petitioner's procedural due process challenge is without merit.

DISPOSITION

The order granting petitioner's petitions for writ of habeas corpus is reversed.


/s/_____
Robie, J.

We concur:


/s/_____
Raye, P. J.


/s/_____
Hoch, J.